## Solomon v. Massachusetts Mutual Life Insurance Co.

C.P. of Philadelphia County, no. 9602-0025.

*Mark C. Rifkin,* for plaintiff.

*E. David Chanin* and *Vaughn C. Willams,* for defendant.

LEVIN, *J.,* January 19, 2000—Before this court are plaintiff's motion for class certification and all responses

thereto. The court held hearings on plaintiff's motion on December 8, 1998 and February 12, 1999. For the reasons stated below, the court denies plaintiff's motion.

## INTRODUCTION

Mark Solomon has filed this class action lawsuit against Massachusetts Mutual Life Insurance Company. Solomon's complaint contains five causes of action arising out of a whole life insurance policy[1] Solomon purchased from MassMutual.[2] At the core of this suit is plaintiff's allegation that MassMutual induced him and other policyholders to purchase whole life policies based on misleading sales presentations and marketing materials. Plaintiff contends that the sales presentations and marketing materials were misleading because defendant's "illustrations"—schedules that projected annual premiums and other values associated with the policy—showed that Solomon and other policyholders would pay premiums for a finite period, after which point the earnings on the accumulated funds and dividends on the policy would cover future premiums. (Compl. ¶17.) MassMutual al-

---

1. Solomon's policy uses the "N-Pay" concept, commonly referred to as a "vanishing premium" method, as a way of paying premiums. MassMutual describes the N-Pay as "[a] strategy for shortening the number of years [a policyholder has] to pay premiums 'out-of-pocket' to complete [the policyholder's] permanent plan of life insurance protection. The 'N' in N-Pay represents the year after which future dividends plus the current balance of paid-up additions (based on current dividend scale, which is not guaranteed) are sufficient to pay all future premiums." (Def.'s class certification hrg., exhibit 2.)

2. Plaintiff's causes of action are: (1) breach of contract, (2) fraud, (3) negligent misrepresentation, (4) violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §201-1 et seq. and (5) unjust enrichment. Complaint ¶¶31-37, 38-50, 51-62, 63-67, 68-73.

legedly induced policyholders to purchase the policies by misrepresenting or omitting: (1) the number of out-of-pocket payments a policyholder would have to pay, and the cash value, surrender values, and/or benefits a policyholder would realize based on a particular number of cash payments; (2) that life insurance is not an investment; (3) that MassMutual would use part of a policyholder's payment for mortality charges, agent commissions, or other sales and administrative charges; (4) the true rate of return that policyholders would earn by purchasing the policy; and (5) how the policy compared with other investment vehicles. (Pl.'s compl. ¶8(a)-(f).)

In addition to those alleged omissions, plaintiff alleges that "[t]he policy illustrations . . . contained inadequate warnings to the effect that the dividends of MassMutual, which were illustrated at current levels, were not guaranteed and could be reduced if, for example, interest rates fell, investment returns declined, expenses increased and/or mortality increased." (Compl. ¶44.)

Plaintiff also alleges that "[t]he sales presentations and policy illustrations failed to inform or otherwise warn policyholders that if MassMutual's dividends were reduced in future years, which is what ultimately happened, the required payments would not vanish as illustrated, and additional payments would be required to the policy owner. At no time were plaintiff and members of the fraud class informed of this risk." (*Id.*)

Defendant denies all substantive allegations of Solomon's complaint and argues that he has not satisfied the requirements for class certification, as set forth in Pennsylvania Rules of Civil Procedure. Thus, defendant contends that the litigation of these issues should have to proceed, if at all, on an individual basis.

The pleadings in this matter are closed. This court overruled defendant's preliminary objections to plaintiff's complaint on November 19, 1996, and denied defendant's motion for summary judgment on October 8, 1998. Accordingly, the court makes the following findings of fact.

## I. FINDINGS OF FACT

(1) Plaintiff Mark Solomon is a resident of the Commonwealth of Pennsylvania.

(2) Defendant MassMutual is a mutual life insurance company and is authorized to do business and does business in the Commonwealth of Pennsylvania and City of Philadelphia.

(3) MassMutual issues products through a network of independently contracting general agents who in turn contract with insurance agents.

(4) MassMutual's life insurance products are underwritten at and issued from MassMutual's headquarters in Springfield, Massachusetts.

(5) Plaintiff's suit has been filed as a class action on behalf of the following proposed class:

"(a) all persons who purchased an ownership interest in one or more whole life insurance policies . . . issued by Massachusetts Mutual Life Insurance Company . . . and who have had defendant MassMutual demand or seek additional payments for the policies beyond the stated number of years and/or whose payments for the policies have not earned returns at the stated or illustrated rates (the contract class) and;

"(b) all persons or entities who have or had at the time of the policy's termination, an ownership interest in one or more of the policies issued by defendant MassMutual

at any time since February 7, 1990 (the fraud class). (Compl. ¶6.)

(6) On or about November 30, 1992, Solomon purchased a whole life policy that used the N-Pay concept (policy no. 8-840-198) from MassMutual.[3]

(7) MassMutual used illustrations titled "Massachusetts Mutual Life Insurance Company, Hypothetical Insurance Company Illustration" to sell its life insurance policies. (Afft Patricia Geoffrey ¶1.)

(8) The content and format of MassMutual's sales illustrations changed periodically during the class period.

(9) The 1990 sales illustration stated in pertinent part:

"Dividends are not guaranteed and are subject to significant fluctuations. Changes in dividends will change all non-guaranteed values." (*Id.* at exhibit A.)

(10) In addition to the 1990 illustration, MassMutual provided its agents with a "lower rate" illustration which used a dividend rate lower than had been previously illustrated.

The 1990 "lower rate" illustration stated in pertinent part:

"The dividends reflected in this illustration are lower than those currently being paid. Different dividends may affect the number of cash premium payments.

"Under the N-Payment dividend option used in this illustration, dividends are used to buy paid-up additions for 12 years. Then, premiums are paid from dividends and paid-up additions as needed. A dividend change may

---

3. Specifically, Solomon, as settlor for an irrevocable trust, purchased the policy. In denying defendant's motion for summary judgment, this court found that Solomon had a sufficient interest in this litigation to have standing to pursue claims on behalf of the trust. *Solomon v. Massachusetts Mutual Life Insurance Co.,* no 9602-0025 (C.P. Phila. Cty. Oct. 8, 1998).

increase or decrease the number of cash premium payments. Dividends are not guaranteed. They reflect the investment, mortality expense, and federal income tax experience of the company. Changes in experience can subject dividends to significant fluctuations. This special illustration is based on dividends lower than those currently being paid. It approximates what the results might be if the investment component of the dividend reflected a return on investments 1 percent below that used in the scale currently being paid." (Afft Patricia Geoffrey, exhibit B.)

(11) In 1991, MassMutual added the following language to its N-Pay illustration:

"Dividends are not guaranteed. Due to new federal taxes and current economic conditions, a 1992 dividend reduction is expected. This will lower all non-guaranteed values.

"Based on the 1991 dividend schedule, dividends are not guaranteed. Due to federal taxes and economic conditions including declining interest rates, dividends based on the 1992 dividend schedule are expected to be lower than those shown in the illustration." (*Id.* at exhibit C.)

(12) MassMutual attached to the 1991 N-Pay illustrations a 1991 surrender comparison disclosure, which stated:

"The index reflects illustrative dividends based upon the current year's dividend scale. In the case of participating life insurance policies, the index may change since future dividends are subject to change, depending on the company's experience. If future dividends increase within the five-, 10- or 20-year period, the index will be lower; if dividends decrease, the index will be higher. Dividends are neither guarantees nor estimates of future results." (*Id.* at exhibit D.)

(13) In 1992, MassMutual added the following language to its 1992 illustration, dated May 1, 1992:

"We strongly recommend you look at an illustration showing a lower dividend scale. See attached footnotes, assumptions, valuations and explanations." (*Id.* at exhibit E.)

(14) In the footnotes of the 1992 illustration, MassMutual added the following language: "This illustration is neither a projection nor an estimate of future results." (*Id.*)

(15) The illustration MassMutual provided to Solomon, dated October 1, 1992, stated in pertinent part:

"Dividend option: dividends are used to buy paid-up additions for 12. Then, premiums are paid from dividends and paid-up additions, as needed (N-Pay concept) a dividend change may increase the number of cash premium payments." (Pl.'s class certification, exhibit 1 at 1.)

Solomon's illustration also states:

"Dividends are not guaranteed and are subject to significant fluctuations. Changes in dividends will change all non-guaranteed values." (*Id.*)

On page three under the heading "Footnotes," Solomon's illustration adds:

"Based on the 1992 dividend schedule, dividends are not guaranteed and can fluctuate significantly. This illustration is neither a projection nor an estimate of future results. . . .

"+ A dividend change may increase or decrease the number of cash premium payments." (*Id.* at 3.)

(16) The 1992 illustration that the sales agent provided to Solomon does not state: "We strongly recommend you look at an illustration showing a lower dividend scale."

(Compare pl.'s class certification, exhibit 1 with afft Patricia Geoffrey, exhibit E.)

(17) In the 1993 N-Pay sales illustration, MassMutual added the following language:

"Due to lower market interest rates, dividends on the 1995 dividend scale are likely to be lower than those shown. We strongly recommend you look at a lower scale illustration. Dividends may be lower or higher in the long-term." (Afft Patricia Geoffrey, exhibit F.)

(18) In 1993, MassMutual added to its N-Pay illustrations a one-page attachment which attempts to explain the N-Pay strategy. (See *id.,* exhibit G.)

(19) Also in 1993, in addition to the attachment, MassMutual provided its sales agents with a document titled "N-Pay strategy," which describes the N-Pay as: "[a] strategy for shortening the number of years [a policyholder has] to pay premiums 'out-of-pocket' to complete [the policyholder's] permanent plan of life insurance protection. The 'N' in N-Pay represents the year after which future dividends plus the current balance of paid-up additions (based on current dividend scale, which is not guaranteed) are sufficient to pay all future premiums." (Def.'s class certification hrg., exhibit 2.)

(20) That same document explains how the N-Pay works:

"For the first 'N' years, premiums are paid in full and dividends are used to purchase paid-up additions—adding to the total benefit of the policy.

"Once reaching the 'N,' premiums are paid from dividends and, if necessary, paid-up additions are surrendered to provide cash needed to pay the amount not covered by the current dividend.

"If the dividend schedule changes, the policy may N-Pay earlier, later, or N-Pay as scheduled and a short time

later require the resumption of out-of-pocket premiums." (*Id.*)

(21) The "N-Pay strategy" document also describes the difference between an N-Pay policy and one that uses dividends to pay future premiums:

"Using dividends to reduce the premium allows for a reduction of out-of-pocket premium beginning in the second year, whereas under the N-Pay strategy the full premium is paid out of pocket until the 'N' year. However, the point at which the out-of-pocket premiums are no longer needed is usually much later when the dividend is used to reduce the premium than when the N-Pay strategy is used." (*Id.*)

(22) The "N-Pay strategy" document also states that the policy is not paid up once the "N" year is reached:

"The N-Pay period and the sufficiency of dividends to pay premiums depend on dividend results which are not guaranteed. Changes in the current dividend scale may cause a situation where the 'N' year is earlier or later than originally illustrated. Even if the 'N' year does not change, dividend fluctuations may result in the 're-appearance' of out-of-pocket premiums due in later years to assure the continuation of the insurance plan." (*Id.* at 2.)

(23) The salesperson who testified for MassMutual stated that "in most cases" he uses the N-Pay strategy document. (Notes of Testimony, Feb. 12, 1999 at 29; def.'s class certification, exhibit 9.)

(24) In the 1994 lower-than-current-dividend scale illustration, MassMutual stated:

"Dividends are not guaranteed. If paid in sufficient amounts, dividends will reduce the number of annual premiums that must be paid in cash. This special illustration is based on dividends lower than those currently

being paid. It approximates what the results might be if the investments component of the dividend reflected a return of investments 2 percent below that being used in the 1995 dividend scale. . . .

"This special illustration is based on dividends lower than those currently being paid. It approximates what the results might be if the investment component of the dividend reflected a return on investments 2 percent below that being used in the 1995 dividend scale." (*Id.* at exhibit H.)

(25) For the 1995 illustration, MassMutual added:

"Dividends in future years may be lower or higher, depending on the company's actual experience. Due to this fact, we strongly recommend you look at a lower scale illustration." (*Id.* at exhibit I.)

(26) Also in 1995, MassMutual provided agents with forms that policyholders could sign which stated:

"Dividends are not guaranteed and are subject to significant fluctuations. Changes in dividends will change all non-guaranteed values.

"I (we) have reviewed this hypothetical policy illustration which I (we) understand is not part of the policy contract. I (we) also understand that some of the values and benefits are not guaranteed and are likely to change in the future." (*Id.* at exhibit J.)

(27) Effective January 1, 1997, MassMutual requested policyholders and agents to sign the illustrations used during the sales presentation. (*Id.* at 7.)

(28) Effective July 1, 1997, MassMutual required policyholders and agents sign the illustrations. (*Id.* at 8.)

(29) For the 1998 illustration, MassMutual added the following:

"Information about premium payment under the N-Pay strategy:

"This illustration is not for a paid-up policy or a guaranteed limited payment policy. The policy requires payment of premiums for the lifetime of the insured. This illustration assumes that only the first 13 years of the premiums are paid in cash. It is assumed that subsequent premiums will be paid by the application of current dividends, or the surrender of dividend additions, or both. This method of paying policy premiums is known as 'N-Pay' and should not be confused with 'paid up.' A policy which is 'paid up' has no further premiums and guarantees the continuation of coverage regardless of future dividends. In contrast, N-Pay requires the payment of contract premiums every year.

"Dividends are not guaranteed. If dividends are sufficient, they can help reduce the number of annual premiums that must be paid in cash. This illustration shows the results of using the 1998 dividend scale to reduce the required number of cash premiums.

"If actual dividends are lower than assumed in the illustration, cash payments may be required for more than 13 years, or if cash premiums payments are stopped after 13 years, payments may have to be resumed at a later date. To see how your policy could be impacted, it is strongly recommended you carefully review the numeric summary and signature page which shows results based on midpoint assumptions which reduce dividends by 50 percent. In addition, you may ask your agent to prepare an illustration based on a different lower dividend scale." (*Id.* at exhibit K.)

The 1998 illustration also stated:

"This illustration assumes that the currently illustrated non-guaranteed elements will continue unchanged for all years shown. This is not likely to occur, and actual results may be more or less favorable than those shown." (*Id.* at 9.)

(30) Plaintiff's expert testified that all of MassMutual's illustrations are misleading because:

"It doesn't give [the policyholder] any information about the financial strength of the company, about their investment results, their mortality experience. It doesn't give [the policyholder] anything other than a statement that says it may be different[.] . . ." (Notes of Testimony Dec. 8, 1998 at 80.)

(31) Plaintiff's expert also stated that the illustrations materially omitted: (1) the excess interest rate (*i.e.,* the interest rate which exceeds the guaranteed rate of interest contained in the policy) (*id.* at 81-82); (2) the magnitude of the change in dividend MassMutual expected (*id.* at 87); and (3) MassMutual's investment portfolio. (*Id.* at 88.)

(32) MassMutual's agents sometimes provide prospective policyholders a copy of MassMutual's annual report, containing information about MassMutual's investments. (Notes of Testimony Feb. 12, 1999 at 19; see def's class certification, exhibit 5 at 31.)

(33) MassMutual's agent sometimes provides prospective policyholders a document titled "Performance Review," which MassMutual's salesperson uses as a summary of the annual report. (Notes of Testimony Feb. 12, 1999 at 21-22; def.'s class certification, exhibit 6.)

(34) In some sales presentations, MassMutual agents provide prospective policyholders with a document titled "Quality and Performance" that, among other things, shows the historical performance of MassMutual's dividends, provides the ratings MassMutual receives from rating agencies, and compares MassMutual's financial strength with other insurance companies. (Notes of Testimony Feb. 12, 1999 at 22-26; def.'s class certification, exhibit 7.)

(35) Information about MassMutual's financial strength is also contained in documents titled "Important Facts" and "Straight Answers about Investment Management," which MassMutual's salespersons occasionally provide to prospective policyholders. (Notes of Testimony Feb. 12, 1999 at 26, 30; def.'s class certification, exhibits 8, 10.)

(36) Information about MassMutual's dividend practice is also contained in a newsletter (called *The Word*) which MassMutual prepares for its sales agents, who occasionally use the information in their sales presentations. (Notes of Testimony Feb. 18, 1999 at 36-37; def.'s class certification, exhibits 11, 12, 13.)

(37) The MassMutual salesperson who testified, stated that he provides an oral presentation along with the illustrations and other written materials. (Notes of Testimony Feb. 18, 1999 at 33-34.)

(38) The salesperson testified that in his oral presentation:

"[He] spend[s] some time describing the components of what goes into making up a dividend and how the board of directors meet once a year to determine what the dividend will be for that coming year, and I talk about the fact that dividends are derivative of interest rates, mortality and expenses and how all of those three aspects, how they play into the size of the dividend." (Notes of Testimony Feb. 18, 1999 at 34.)

(39) The MassMutual salesperson does not present the same oral presentation to every prospective policyholder. (*Id.* at 34-35.)

(40) No evidence was presented to show that MassMutual sales agents' sales presentations followed a script.

## II. DISCUSSION

It is this court's present responsibility to determine whether plaintiff's suit is properly certifiable as a class action. In this respect, our authority is limited by the Pennsylvania Rules of Civil Procedure: "[t]he hearing is confined to a consideration of the class action allegations and is not concerned with the merits of the controversy or with attacks on the other averments of the complaint. Its only purpose is to decide whether the action shall continue as a class action or as an action with individual parties only." Pa.R.C.P. 1707 (Explanatory note— 1977).

Thus, for the time being, we must refrain from ruling on plaintiff's ultimate right to recovery and on the merits of any defenses raised.[4]

Our decision at this stage is limited to whether the plaintiff has satisfied the requirements described in Pennsylvania Rule of Civil Procedure 1702:

*"Rule 1702: Prerequisites to a class action*

"One or more members of a class may sue or be sued as representative parties on behalf of all members in a class action only if

"(1) the class is so numerous that joinder of all members is impracticable;

"(2) there are questions of law or fact common to the class;

"(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;

---

4. Specifically, we note that the defense of failure to state a claim upon which relief can be granted is *not* waived if preserved until after certification. See Pa.R.C.P. 1705 (Explanatory note—1977).

"(4) the representative parties will fairly and adequately assert and protect the interests of the class under the criteria set forth in Rule 1709; and

"(5) a class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708."

In determining if these criteria are satisfied, the court is clearly vested with broad discretion. *Cambanis v. Nationwide Insurance Co.,* 348 Pa. Super. 41, 51, 501 A.2d 635, 640 (1985) (court has authority to certify certain claims, issues or forms of relief and not others); *Janicik v. Prudential Insurance Co. of America,* 305 Pa. Super. 120, 135, 451 A.2d 451, 457 (1982) (same). See Pa.R.C.P. 1710(c)(1); *Klemow v. Time Inc.,* 466 Pa. 189, 197, 352 A.2d 12, 16 (1976); *Prime Meats Inc. v. Yochim,* 422 Pa. Super. 460, 467, 619 A.2d 769, 773 (1993).

However, we recognize that decisions in favor of maintaining a class action should be liberally made. *D'Amelio v. Blue Cross of Lehigh Valley,* 347 Pa. Super. 441, 448, 500 A.2d 1137, 1141 (1985); *Bell v. Beneficial Consumer Discount Co.,* 241 Pa. Super. 192, 205, 360 A.2d 681, 688 (1976) (class suits enable the assertion of many meritorious claims that might not otherwise be litigated). Accord *Janicik,* 305 Pa. Super. at 128, 451 A.2d at 454.

In exercising our discretion, this court recognizes that the burden of proving that class certification is appropriate clearly falls upon the party seeking certification. *D'Amelio v. Blue Cross of Lehigh Valley,* 347 Pa. Super. 441, 449, 500 A.2d 1137, 1141 (1985); *Janicik v. Prudential Insurance Co.,* 305 Pa. Super. 120, 128, 451 A.2d 451, 454 (1982). The proponent must present evidence sufficient to make out a prima facie case "from which the court can conclude that the class certification requirements are met." *Janicik,* 305 Pa. Super. at 130, 451 A.2d

at 455. If the defendant presents contrary evidence establishing an actual conflict on an essential fact, the proponent "bears the risk of non-persuasion." *Id.*

Given this context, the court will enumerate the factors it considered in ruling on class certification.

## A. *Numerosity*

To satisfy this criterion, the class must be both numerous and identifiable. A class is sufficiently numerous when "the number of potential individual plaintiffs would pose a grave imposition on the resources of the court and an unnecessary drain on the energies and resources of the litigants should [plaintiffs] sue individually." *Temple University v. Pennsylvania Department of Public Welfare,* 30 Pa. Commw. 595, 603, 374 A.2d 991, 996 (1977) (123 plaintiffs sufficiently numerous); *ABC Sewer Cleaning Co. v. Bell of Pennsylvania,* 293 Pa. Super. 219, 225, 438 A.2d 616, 619 (1981) (250 plaintiffs sufficiently numerous); *Ablin Inc. v. Bell Telephone Co.,* 291 Pa. Super. 40, 51, 435 A.2d 208, 214 (1981) (204 plaintiffs sufficiently numerous). When a class is narrowly and precisely drawn, but there are still so many potential members that joinder is impractical or impossible, the class is sufficiently delineated to satisfy the numerosity requirement. *Weismer v. Beech-Nut Nutrition Corp.,* 419 Pa. Super. 403, 408, 615 A.2d 428, 430 (1992), citing *Cribb v. United Health Clubs,* 336 Pa. Super. 479, 481, 485 A.2d 1182, 1184 (1984). A class is not sufficiently identifiable "whe[n] the class definition is so poorly established that the court [is unable to] discern who the potential class members are. . . ." *Weismer,* 419 Pa. Super. at 408, 615 A.2d at 430; *Dickler v. Shearson Lehman Hutton Inc.,* no. 9002-2653 (C.P.

Philadelphia County April 17, 1997) (Levin, J.) (proposed class not identifiable because plaintiffs' inconsistent pleadings prevented court from identifying the class of potential plaintiffs).

Defendant argues that plaintiff's class, as presently defined, fails to satisfy the numerosity requirement because the class is "vastly overbroad," and thus the court cannot identify potential members of the class. The proposed class is overbroad, defendant contends, because it is not limited to persons who purchased policies under the N-Pay concept. Even if the class were limited to only N-Pay policy purchasers, MassMutual maintains that the court could not identify those members because MassMutual's database is not capable of identifying policies purchased pursuant to MassMutual's N-Pay concept. (Def.'s opp'n mem. at 103.) Because identifying policies sold under the N-Pay concept would require MassMutual to manually search each policy, defendants maintain the class cannot be properly identified.

Plaintiffs respond that administrative difficulties do not prevent the plaintiff from satisfying numerosity.

The court agrees with defendant that plaintiff's class—as currently defined—is overbroad. However, we disagree that administrative difficulties are sufficient to defeat numerosity. By narrowing the class to purchasers of policies under the N-Pay concept, the court is able to identify potential members of the class. Defendant's argument about the administrative difficulty of identifying actual N-Pay policy purchasers really addresses the class' manageability and not its numerosity. Therefore, we find that there are sufficient N-Pay policy purchasers such that joinder of those members is impracticable, and thus numerosity is satisfied.

## B. *Commonality* [5]

For class certification, plaintiffs must also establish that their claim presents "questions of law or fact common to the class." Pa.R.C.P. 1702(2). "The common question of fact means precisely that the facts must be substantially the same so that proof as to one claimant would be proof as to all." *Allegheny County Housing Authority v. Berry,* 338 Pa. Super. 338, 342, 487 A.2d 995, 997 (1985); *Cook v. Highland Water and Sewer Authority,* 108 Pa. Commw. 222, 231-32, 530 A.2d 499, 504 (1987).

While the existence of individual questions essential to a class member's recovery is not necessarily fatal to the class, there must be a *"predominance* of common issues, shared by all the class members, which can be justly resolved in a single proceeding." *Weismer,* 419 Pa. Super. at 408-409, 615 A.2d at 431 (emphasis in original); *D'Amelio,* 347 Pa. Super. at 451, 500 A.2d at 1142 and *Janicik,* 305 Pa. Super. at 133, 451 A.2d at 457. See Pa.R.C.P. 1708(a)(1).

In cases involving contracts, if the circumstances surrounding the application for and issuance of each contract must be considered to determine defendant's liability, then "it is impossible to find that there are questions of fact common to all class members." *Hayes v. Motorists Mutual Insurance Co.,* 370 Pa. Super. 602, 609, 537 A.2d 330, 333 (1987).

---

5. The court will consider under the commonality requirement Rule 1708(a)(1)'s requirement that "common questions of law and fact must predominate over any question affecting only individual members." Pa.R.C.P. 1708(a)(1). In addition, under commonality, the court will consider Solomon's fraud-based claims (*i.e.,* fraud, negligent misrepresentation and Consumer Protection Law) separately from his contract-based claims (*i.e.,* breach of contract and unjust enrichment and imposition of a constructive trust).

## 1. Contract-Based Claims

Solomon argues that the commonality requirement is satisfied because MassMutual presented uniform sales presentations, sales materials and policy illustrations which misled and deceived him and other purchasers of MassMutual's policies. Plaintiff argues that the illustrations uniformly failed to present the following material information: (1) the composition of MassMutual's investment pools; (2) MassMutual's dividend rates; (3) that MassMutual was earning reduced interest on its investments; (4) that MassMutual believed its investments were insufficient to support the policy illustrations for two years; (5) that MassMutual's board of directors exercises discretion to adjust dividends paid and interest credited on the permanent life insurance policies each year. (See pl.'s reply at 11.) Defendant argues that MassMutual's liability cannot be decided using the illustrations alone because other written and/or disclosures by MassMutual must be considered to decide whether MassMutual fraudulently deceived and failed to disclose material information to policyholders.

The court agrees that plaintiff's and the class' contract claims lack sufficient commonality because class-wide adjudication of the contract claims would require the court to consider the circumstances surrounding the issuance of each N-Pay policy. Resolving plaintiff's contract claim class-wide would require individual inquiries into (1) the variety of oral and written representations MassMutual made about the N-Pay policy; (2) which illustration MassMutual showed the prospective class member; and (3) other extra-contractual discussions between the policyholder and MassMutual. The court cannot decide the class' contract claim based on the illustrations alone because the material information

MassMutual allegedly omitted from its illustrations was disclosed in other written materials or in MassMutual agents' customized sales presentations. In addition, the plaintiff has failed to refute defendant's evidence that the sales presentations were non-uniform. This lack of uniformity precludes Solomon from satisfying the commonality criterion because he has failed to refute MassMutual's evidence that it did not engage in a similar practice or course of conduct when it issued the N-Pay insurance policies. See *Hayes,* 307 Pa. Super. at 609, 537 A.2d at 333; see *Janicik, supra* at 130, 451 A.2d at 455 (finding that the "class proponent bears the risk of non-persuasion" when there is a conflict on an essential fact). Accordingly, the court finds that common issues related to defendant's knowledge about the accuracy of its sales illustrations does not predominate over the individual issues relating to circumstances surrounding each policy-member's purchase of the policy.

## 2. Fraud-Based Claims

Plaintiff's fraud claims lack commonality because individual issues of reliance upon and the materiality of MassMutual's misrepresentations and omissions predominate over common issues of defendant's knowledge about the assumptions underlying its sales illustrations. Fraud-based claims are unsuitable for class-wide resolution because resolving those claims typically requires individual proof of reliance and materiality. *Klemow v. Time,* 466 Pa. 189, 197, 352 A.2d 12, 16 (1975); *DiLucido v. Terminix,* 450 Pa. Super. 393, 402, 676 A.2d 1237, 1241 (1996); *Prime Meats Inc. v. Yochim,* 422 Pa. Super. 460, 467, 619 A.2d 769, 773 (1993). Plaintiff argues that both materiality and reliance can be litigated class-wide, under this court's rationale in *Lewin v. Saidel,* no 9604-0015 (Dec.

19, 1997). In *Lewin,* this court certified plaintiff's fraud claim because it determined, based on expert testimony, that the nondisclosure was material to all the plaintiffs.[6] Here, plaintiff maintains that the materiality element can be decided class-wide because defendant uniformly omitted: the assumptions upon which the illustrations were based, that MassMutual regarded its illustrations as not even its "best guess" about how the policies would perform, and that MassMutual believed there was a "substantial probability that its economic performance would not support the illustrations for two years, despite that the illustrations assumed that the company's financial performance would remain constant forever." (Pl.'s reply at 18.) Given the purported materiality of these alleged omissions, plaintiff argues that reliance can be presumed.

This court disagrees because—unlike plaintiff's claims in *Lewin*—Solomon's claims are not based on a single communication from the defendant. In *Lewin,* the class' claims focused on the adequacy of defendant's proxy statement. To resolve Lewin's claim, this court did not need to scrutinize other communications made between the plaintiff and defendant. Here, defendants communicated with plaintiffs by oral sales presentations and written marketing material, all utilizing a variety of brochures, documents, charts and illustrations. Unlike in *Lewin,* to resolve Solomon's fraud claims class-wide, this court must consider the array of communications between

6. In *Lewin,* officers of the defendant bank failed to notify shareholders that another bank had offered to purchase the shareholders' bank. Plaintiffs' expert based his opinion that the nondisclosure of an offer to purchase the bank was material to each and every shareholder because of the bank's small size, low share liquidity, limited potential for expansion and various conditions in the market. *Lewin v. Saidel,* no. 9604-0015. (Mem. op., Dec. 19, 1997.)

58

MassMutual and N-Pay policyholders. Given the factual dissimilarity between this case and *Lewin,* the court will hew to the dictates of *Prime Meats* and *DiLucido* and not certify plaintiff's fraud, negligent misrepresentation and Consumer Protection Law claims because they involve critical and individual issues of reliance, materiality and causation.[7]

## C. *Typicality*

Plaintiffs must also demonstrate that their "claims or defenses . . . are typical of the claims or defenses of the class." Pa.R.C.P. 1702(3). This factor requires that "the class representative's overall position on the common issues is sufficiently aligned with that of the absent class members to ensure that her pursuit of her own interests will advance those of the proposed class members." *D'Amelio,* 347 Pa. Super. at 458, 500 A.2d at 1146; *Janicik,* 305 Pa. Super. at 134, 451 A.2d at 457; *Ablin,* 291 Pa. Super. at 47, 435 A.2d at 212. See also, 1 Newberg on Class Actions §1115a.[8] "Failure to find commonality . . . necessitates a conclusion that the typicality requirement of Rule 1702(3) has likewise not been met." *Hayes*

---

7. The Superior Court's recent decision in *Weinberg v. Sun Company Inc.,* 740 A.2d 1152 (Pa. Super. 1999), does not change the court's decision to not certify plaintiff's Consumer Protection Law claim. Unlike *Weinberg's,* Solomon's CPL claim is grounded in the fraud-based provisions of the CPL, not its false advertising provisions. Thus, reliance is still a constituent element of Solomon's CPL claim. See pl.'s compl. at ¶¶63-68.

8. "Self-interest, the motivating force that sparks the adversary system, also sustains the doctrine of class actions. We may trust man to help his fellow man if by doing so he helps himself—particularly if *only* by helping others will he be able to protect and promote his own interests. . . . Our system of justice tolerates and at times favors litigation through champions who stand or fall with the whole group." (emphasis in original)

*v. Motorists Mutual Insurance Co.,* 370 Pa. Super. 602, 610, 537 A.2d 330, 334 (1987). If determining defendant's liability requires the court to consider the individual circumstances surrounding the issuance of the contract, then plaintiff's claims lack typicality. *Id.*

Having determined that plaintiff has failed to satisfy commonality, the court concludes that plaintiff has not met the typicality requirement because the individual circumstances surrounding the issuance of each N-Pay policyholder's policy must be considered to determine defendant's liability. *Hayes,* 370 Pa. Super. at 610, 537 A.2d at 334.

## D. *Adequacy of Representation*

For the class to be certified, this court must also conclude that the plaintiffs "will fairly and adequately assert and protect the interests of the class." Pa.R.C.P. 1702(4). Adequate representation is evaluated under considerations set forth in Pennsylvania Rule of Civil Procedure 1709. However, having determined that plaintiff failed to satisfy the typicality and commonality requirements, it is "unnecessary for the trial court to consider the remaining . . . elements." *Weismer,* 419 Pa. Super. at 410, 615 A.2d at 431.

## E. *Fair and Efficient Method for Adjudication*

Finally, the court would generally address whether allowing plaintiffs to proceed with adjudication of this suit as a class action would be both fair and efficient. The factors to be evaluated are set forth in Pennsylvania Rule of Civil Procedure 1708. As above, having determined that plaintiff has failed to satisfy the requirements for certification of this case as a class action, we need not reach the merits of this inquiry. *Weismer,* 419 Pa. Super. at 410, 615 A.2d at 431.

## III. CONCLUSIONS OF LAW

(1) The class is sufficiently numerous that joinder of all its members is impracticable.

(2) There is not a predominance of questions of law and fact common to the class.

(3) The claims raised by the representative party are not typical of the claims belonging to, and necessary for, the protection of absent class members.

(4) This court was not required to determine whether the proposed class representative will fairly and adequately assert and protect the interests of the class under the criteria set forth in Rule 1709.

(5) This court was not required to determine whether allowing this matter to proceed as a class action would provide a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708.

For the foregoing reasons, this court determines that the instant case is not appropriate for disposition as a class action and enters the attached order.

## ORDER

And now, January 19, 2000, in consideration of plaintiff's motion for class certification and all submissions related thereto, it is hereby ordered that plaintiff's motion for class certification is denied.